William C. **BYNUM,** Plaintiff,

v.

## FORT WORTH INDEPENDENT SCHOOL DISTRICT, Defendant.

No. 4:98–CV–690–A.

United States District Court, N.D. Texas, Fort Worth Division.

April 6, 1999.

Dennis Gerald Brewer, Sr., Attorney at Law, John Matthew Anthony, Attorney at Law, American Center for Law & Justice of Texas, Irving, TX, for William C. Bynum, plaintiff.

David F. Chappell, Attorney at Law, Chappell & McGartland, Fort Worth, TX, for Fort Worth Independent School District, defendant.

## MEMORANDUM OPINION
### and ORDER

McBRYDE, District Judge.

Came on for consideration the above-captioned action in which William C. Bynum ("Bynum") is plaintiff, and the Fort Worth Independent School District ("FWISD") is defendant. Now before the court is FWISD's motion for summary judgment, filed February 16, 1999. The court, having considered the motion, related filings, and the applicable authorities, concludes that such motion should be granted.

### I.

#### Plaintiff's Complaint

On September 28, 1998, Bynum filed his first amended complaint, his current live pleading. In it, Bynum alleges that:

Bynum is a Seventh Day Adventist whose religious tenets require that he not work from sunset on Friday until sunset on Saturday. On July 20, 1995, FWISD hired Bynum as a Junior Reserve Officers' Training Corps ("JROTC") instructor. At the time of his employment, Bynum informed FWISD and his supervisor, Major Negal Williams, U.S.A. Retired, ("Major Williams") of his religious tenets. In response, Major Williams, an agent of FWISD, effectively waived FWISD's requirement that Bynum work at least one full weekend each month.

Before becoming employed by FWISD, Bynum had been certified by the United States Army as a JROTC instructor. Certification by the Army was a necessary credential to gaining and retaining employment as a JROTC instructor.

After approximately one year of employment, FWISD issued Bynum an unsatisfactory performance evaluation for the rea-

son that he did not work between sunset on Fridays and sunset on Saturdays. FWISD also requested that Bynum resign because of his religious beliefs. Furthermore, Lieutenant Colonel Herman J. Vanbebber, U.S.A. Retired ("Lieutenant Colonel Vanbebber"), an employee of FWISD, informed Bynum that FWISD would actively seek to have Bynum decertified as a JROTC instructor by the U.S. Army unless he resigned. Finally, FWISD refused to accommodate Bynum's sincerely held religious beliefs.

Bynum refused to resign. FWISD then took action to cause Bynum to be decertified by the U.S. Army, as threatened in the unsatisfactory performance evaluation issued by Vanbebber. Bynum still refused to resign. On August 12, 1996, FWISD placed Bynum on "suspension with pay" status through mutual agreement between Bynum and FWISD.

The U.S. Army did, in fact, decertify Bynum on September 20, 1996. FWISD terminated Bynum's employment on October 23, 1996. Bynum was unable to obtain any position as a JROTC instructor due to the decertification. Although Bynum was placed on a "suspension with pay" status from August 12, 1996, to October 23, 1996, and reassigned to work at another high school in the district during part of that time, FWISD did not pay Bynum for that period of time. Finally, when FWISD terminated Bynum it violated an employment contract he had with FWISD for the 1996–1997 school year.

The counts alleged by Bynum in his amended complaint are as follows:

*Count One:* FWISD discriminated against Bynum with respect to the compensation, term, conditions, and privileges of his employment, and ultimately discharged him, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII").

*Count Two:* FWISD breached the employment contract between FWISD and Bynum when it terminated his employ-

ment on October 23, 1996. Additionally, FWISD failed to pay Bynum for the time he was suspended with pay, constituting a second breach of contract. Bynum suffered economic damages as a result of such breaches of contract.

*Count Three:* Bynum demands attorney's fees pursuant to 42 U.S.C. § 2000e–5(k) and Texas Civil Practices and Remedies Code § 38.001.

## II.

### FWISD's Motion for Summary Judgment

FWISD first argues that summary judgment is appropriate because Bynum was not discharged, or subjected to discipline, for failing to comply with an employment requirement that conflicted with a bona fide religious belief held by Bynum. According to FWISD, the summary judgment record reflects that Bynum's employment was terminated because he no longer was eligible to serve as a JROTC instructor by reason of the U.S. Army's withdrawal of his certification to serve as such an instructor. FWISD asserts that the U.S. Army is solely responsible for Bynum's certification as a JROTC instructor being withdrawn. Following the U.S. Army's withdrawal of Bynum's certification, Bynum was no longer authorized to instruct the JROTC program for FWISD. Accordingly, FWISD terminated Bynum's employment as required by Army regulations and federal law. And, FWISD maintains more generally that it took no adverse employment action against Bynum of a kind proscribed by Title VII.

Second, FWISD argues that it accommodated Bynum's religious beliefs to the extent required by law. FWISD argues that, for this reason alone, it is entitled to summary judgment on Bynum's claims under Title VII.

Addressing Bynum's claims for breach of contract, FWISD asserts that Bynum failed to exhaust the necessary administrative remedies before filing his breach of

contract claims, and that, therefore, the court is without jurisdiction to hear such claims. Furthermore, it maintains that the undisputed summary judgment evidence demonstrates that Bynum was paid by FWISD in full for the duration of his suspension with pay. Therefore, such claim for breach of contract must fail as a matter of law.

## III.

### Applicable Summary Judgment Principles

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248, 256, 106 S.Ct. 2505. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s][its] claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). An issue is material only if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Simmons v. Lyons*, 746 F.2d 265, 269 (5th Cir.1984).

The standard for granting a summary judgment is the same as the standard for a directed verdict. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 597, 106 S.Ct. 1348.

## IV.

### Undisputed Facts

Bynum, a retired noncommissioned officer of the United States Army, was certified by the Department of the Army in December 1994 to work as a JROTC instructor.[1] The JROTC program is described in one of the exhibits as follows:

The Junior Reserve Officers' Training Corps program originated as part of the National Defense Act of 1916, which authorized the Secretary of War to issue equipment to those secondary schools desiring military training programs. The concept of maintaining a national program of military training for high school students was revalidated and expanded during the Congressional hearings preceding the passage of the ROTC

---

1. The Army Junior Reserve Officers' Training Corps is authorized by 10 U.S.C. § 2031. The regulations prescribing the policies for administering the program are at 32 C.F.R. §§ 542.1–542.7. The summary judgment record contains as exhibits pages from a Department of Army regulation, AR 145–2, pertaining to the JROTC program. Unless otherwise indicated, the references in the text of this memorandum opinion and order to a regulation are to those exhibits.

Vitalization Act of 1964, the statute that governs all ROTC programs. Under this statute, the Army sponsors training in public and private schools as an integral part of the school's curriculum. It is, however, provided by the Army; and the overall performance of the program is closely monitored by the Army.

Pl.'s App. at 000008.[2] The students who enroll as cadets in the program are taught primarily by retired United States Army officers and noncommissioned officers, who are hired by the school system in which they function. The Department of the Army reimburses the hiring school system for a part of the salary paid by the school system to the JROTC instructors on the school system's payroll. 10 U.S.C. § 2031(d)(1). Such a retired member of the military is not, while employed as a JROTC instructor, considered to be on active duty or inactive duty training for any purpose. 10 U.S.C. § 2031(d)(2). However, each instructor's professional qualifications and subsequent performance as an instructor must be approved by the Department of the Army through ROTC Region Headquarters. The standards established by the Department of the Army are high, and include a requirement that the JROTC instructor "reflect the professionalism, dedication, efficiency, effectiveness, and performance of members of the Active Army in an equivalent grade." *Id.* at 000019. The controlling regulation says that "[a]ll instructors detailed or employed to conduct JROTC ... programs ... will adhere to the standards of conduct prescribed by laws applicable to all [Department of Defense] personnel ...," and that "[c]onduct prejudicial to the JROTC ... program[ ] will be cause for immediate disassociation of the individual concerned from the program[ ]." *Id.* at 000020. As one of the exhibits reflects, "[a]ll JROTC personnel must meet Army requirements," and "[t]hey have an individual responsibility to conduct the program according to

Army policy and [the applicable] regulation, and to maintain standards acceptable to the Army." Def.'s App. At 00218.

Bynum's certification was conditional, and the applicable regulation provided that he would be in a conditional certification status throughout his first year of employment by a school. The "performance of JROTC instructors is under continual review"; and, in order to maintain his or her certified status, an instructor must meet, *inter alia,* "conditions for favorable performance review." Pl.'s App. at 000016. "If an instructor is decertified by Cadet Command Headquarters, he/she must be terminated by the school." *Id.* "As employees of the schools, the instructors are primarily responsible to the school officials for the operation of the program." *Id.* at 000010. The duality of the status of JROTC instructors was described as follows in one of the exhibits:

> Retired members employed as JROTC instructors under 10 USC 2031 are members of the Armed Forces not on active duty. The law provides identical authority to the school and the Secretary of the Army to approve the qualifications of administrators and instructors in the program. This dual approval is required for initial and continued employment. The same essential qualifications (other than those related to retired status) and procedures used for assignment of active duty members will be used in approving JROTC ... instructors.

*Id.* at 000018. And, a further explanation was given in another exhibit:

> (1) Except for active duty members, the school, when authorized and approved by the Army, is the employing agency of all other JROTC personnel. Instructors, whom the Army has certified and for whom the school is the employing agency, have a direct respon-

2. Title 10 U.S.C. § 2031 contemplates that each branch of the military service will establish and maintain a Junior Reserve Officers' Training Corps. The discussion in this memorandum opinion pertains to the program established by the Department of the Army.

sibility to the [Director of Army Instruction] for conducting the program. The [Directors of Army Instruction], as department heads (or equivalent status), are responsible to school officials for conducting the program, ensuring that it meets school standards and Army requirements according to Army policy and this regulation.

Def.'s App. at 00218. The regulation authorizes a high school with an enrollment in its JROTC program of more than 150 cadets to have as part of the program staff one retired officer and two retired noncommissioned officers.

Bynum was hired by FWISD on July 20, 1995, to serve as a JROTC instructor at O.D. Wyatt High School. The number of cadets enrolled in the JROTC program at O.D. Wyatt was large enough to authorize the program to be staffed by one retired officer and two retired noncommissioned officers. Major Williams was the retired officer on the staff, and the other retired noncommissioned officer on the staff was SFC Milton E. Hooper, U.S.A. Retired ("Sergeant Hooper"). Though Bynum was told when he was hired that his job duties as a JROTC instructor would include work with the student cadets on Friday evenings and Saturdays, he did not at that time inform the persons who hired him, or those he would be working under or with, of any problem from a religious standpoint in working at those times. Major Williams interviewed Bynum prior to Bynum's employment, and stressed to Bynum the importance of extracurricular activities to the JROTC program, and informed Bynum that the instructor position would require Bynum to work on Friday nights and Saturday afternoons to supervise his student cadets at extracurricular activities. At that time, Bynum told Major Williams that he would be available to work on Friday nights and Saturday afternoons and to otherwise participate in the JROTC program. A brochure/pamphlet Bynum received as part of his certification process explained some of the extracurricular projects a JROTC instructor would be expected to be involved as follows:

6. **Weekends and after normal duty hours:** An instructor may expect to devote 6 to 10 hours at least one Saturday per month to extra-curricular activities during the school year, at least one full weekend (Saturday and Sunday) per semester on encampment and at least 3 to 6 evening hours 2 to 3 times a school year for banquets, awards ceremonies, military ball, and/or athletic events.

7. **Encampments:** during spring/summer encampments, the instructor will normally work 12 – 14 hours per day for two weeks. He will usually spend 1 or 2 days on a rifle range and will participate in foot marching.

Pl.'s App. at 000024.

There is a conflict in the evidence as to when Bynum first informed his co-worker and supervisor of his religious practice as a Seventh Day Adventist of not working between sunset on Fridays and sunset on Saturdays. Giving Bynum the benefit of the summary judgment evidence most favorable to him, in July 1995 he confided his religious affiliation to Sergeant Hooper and/or Major Williams. Bynum told Sergeant Hooper, after the latter became aware of Bynum's religious beliefs, that he had been advised by several influential friends not to disclose his religious work restrictions prior to employment. When they learned of the problem, Sergeant Hooper and Major Williams accommodated Bynum by doing his work for him at certain weekend events at which Bynum's attendance otherwise would have been required as part of his job as a JROTC instructor.

In September 1995 Bynum failed to attend a Saturday morning parade in which the cadets over which he had supervision participated. Bynum appeared at the school that morning to help load his cadets on the bus, and then left. Bynum did not tell Major Williams he was leaving, nor did he ask Major Williams's permission prior

to departing. As a result of Bynum's failure to participate, Major Williams was required to provide for makeshift supervision of the cadets for whom Bynum had responsibility.

The following Monday, Major Williams discussed the problem with Bynum. Bynum told Major Williams that he could no longer perform any work during the time period between sunset on Friday and sunset on Saturday because of his religious beliefs. Major Williams explained to Bynum that his general declination to work during that time period was not acceptable because of the need to have Bynum's assistance in working with the cadets on at least some occasions when Bynum otherwise would prefer not to work because of his religious convictions. About 40% of Bynum's job responsibilities as a JROTC instructor involved participation in JROTC extracurricular activities that occurred Friday nights and Saturday afternoons.

However, Major Williams did agree with Bynum that he would accommodate Bynum by attending in Bynum's place ten upcoming weekend football games for which Bynum otherwise would have responsibility. While Major Williams agreed to accommodate Bynum by attending the Friday night football games, he told Bynum that Bynum would still be required to attend the out-of-town drill meets and all of the events at which more than 150 student cadets were present so that their unit would be in compliance with Army staffing regulations. Major Williams went on to inform Bynum that he and Sergeant Hooper would accommodate him by performing his duties at events in which fewer than 150 cadets from their school would be participating. Thereafter, Bynum was accommodated as Major Williams had promised; and, Bynum himself participated with his cadets five times in major events that occurred on Saturdays.

But, problems continued to develop. The student cadets preferred to have their own instructor in attendance as opposed to another instructor. Resentment developed on the part of Major Williams and Sergeant Hooper over the fact that they were performing an unequal share of the work for which they were not being paid. Then, in April 1996 Bynum committed a rather serious breach of his duties as a JROTC instructor. He failed to attend the Annual Awards Ceremony. He did this notwithstanding specific instructions Lieutenant Colonel Vanbebber had given him that he must attend the ceremony because it was an important part of the JROTC curriculum at which approximately 150 O.D. Wyatt cadets would be in attendance, with the consequence that supervision by all of the O.D. Wyatt JROTC instructors would be required.

In May 1996 Lieutenant Colonel Vanbebber, who was a retired Army officer, evaluated Bynum's performance as a JROTC instructor. As Director of Army Instruction for the Fort Worth Independent School District, Lieutenant Colonel Vanbebber supervised all JROTC instructors within the district.[3] Army regulations specified that he had a dual role as a representative of the Army and as a member of the school district staff.[4] He was

---

3. The role of a Director of Army Instruction ("DAI") is explained in one of the exhibits as follows:

   a. The DAI is the chief administrator of the JROTC ... multiple unit. All JROTC ... instructors and administrators employed by the school will be directly under his supervision in all matters pertaining to their instructor status and assigned military instructor and program administrative duties. His primary responsibility is to ensure, on behalf of the district and the Army, through proper instruction and supervision

that the JROTC ... program is administered according to law, regulation, policy, and principles.
Def.'s App. at 00220.

4. The dual nature of the duties and responsibilities of Lieutenant Colonel Vanbebber are described in the applicable Army regulation as follows:

   b. DAI[s] ... are representatives of the Army and members of the institutional staff. In this dual role, they are responsible to the institutional authorities and must adhere to

responsible for conducting the JROTC program according to Army policy and ensuring that the program maintained standards acceptable to the Army, and was obligated "to adhere to military instructions and represent the interests of the Army" in doing so. AR 145–2, ch. 5, § 1, ¶ 5–2.b. As a part of these responsibilities, he was obligated to ensure that all JROTC instructors maintained Army discipline, respect, and protocol among the different ranks. He considered that his responsibility for ensuring that the JROTC program maintained standards acceptable to the Army was a duty he had directly to the Army, independent of his duties to the school district. The December 8, 1994, memorandum from the Army to Bynum by which he had been advised of his conditional certification put him on notice that he would be required to have a satisfactory evaluation by the Army, as well as by the school officials, for his certification to be continued beyond the first year.

Lieutenant Colonel Vanbebber concluded his evaluation of Bynum's performance with the recommendation that Bynum be encouraged to resign and seek employment that did not require work on Friday night or Saturday, or that Bynum's employment be terminated by FWISD based on the fact that he chose not to perform the essential duties of his job assignment. At approximately the same time of the evaluation, Lieutenant Colonel Vanbebber recommended to one of the administrative officials of FWISD that action be initiated to terminate Bynum's employment, or to decline to renew his contract, on the ground that Bynum's integrity, conduct, and performance were incompatible with, and a detriment to, the success of the JROTC program.

Nevertheless, the officials of FWISD arranged for the renewal of Bynum's contract of employment so that his employ-ment would continue through the scholastic year 1996–1997. The new contract was signed May 15, 1996. However, personnel in the administrative office of the FWISD were pursuing, through communications with an association that represented teachers employed by FWISD, a solution to the problem that would involve a voluntary resignation of Bynum, with the threat that he would be terminated if he did not voluntarily resign. An attorney on the staff of FWISD, having the title "Director of Personnel Legal Services," wrote a letter on May 20, 1996, to the teachers' association advising that he was recommending that Bynum be terminated.

In late May and early June 1996 another crisis developed over Bynum's failure to perform all his duties. Beginning June 1, 1996, and ending June 8, 1996, the participants in the JROTC program throughout the FWISD were to attend a summer camp at the military installation at Fort Sill, Oklahoma. Bynum was assigned to serve as a platoon leader for twenty-six cadets for an eight-day period. Lieutenant Colonel Vanbebber informed Bynum of his duties related to the summer camp by a memo dated May 20, 1996, saying:

MEMORANDUM FOR MSG William C. Bynum, O.D. Wyatt HS

SUBJECT: Duties at JROTC Summer Camp

1. Fort Sill JROTC Summer Camp MOI# 1, copy attached at Tab A, assigns you duty as Platoon leader, 5th Platoon, Company B, from 1200 hours, 1 June to 0800 hours, 8 June 1996. Duties involve constant supervision of approximately 25 cadets.

2. DAI Bulletin # 94, attached at Tab B, assigns cadre duties and responsibilities for escorting 167 Fort Worth JROTC cadets to Fort Sill. You, along with SFC Hooper, are assigned the responsibility of opening the O.D. Wyatt

---

the policies and procedures of the institution. Additionally, the DAI ... must adhere to military instructions and represent the interests of the Army.

AR 145–2, ch. 5, § 1, ¶ 5–2.b.

Armory at 0600 hours and supervising the loading of the 20 O.D. Wyatt cadets for departure at 0700. Major Williams will already be at Fort Sill. 138 JROTC instructors (15 from Fort Worth) will perform duties during the period 30 May – 15 June.

3. You are obligated, as an integral part of your job assignment, to be present, in a supervisory and instructional role, when cadets are involved in JROTC related activities. JROTC cadet activities involving O.D. Wyatt cadets began at 0600 hours, 1 June and end at approximately 1200 hours, 8 June. Your duty station, during the period 0700 hours, 1 June to approximately 1200 hours, 8 June, is either enroute [sic] to, at or returning from Fort Sill, Ok.

4. Failure to perform any portion of the above duties, without prior approval, will be considered willful disobedience of a lawful directive.

/s/

HERMAN J. VANBEBBER

LTC, USA Retired

Director

Def.'s App. at 00127.

After Bynum made known that he would not perform all his duties related to the Fort Sill summer camp, Lieutenant Colonel Vanbebber assigned other instructors employed by the FWISD JROTC department to perform Bynum's responsibilities in addition to their own, and changed the work schedules so that Bynum would not perform any duties on Saturday, June 1, Friday, June 7, and Saturday, June 8. Bynum's declination to perform all his duties caused inconvenience and disruption in the activities related to the student cadets who were participating in the summer camp. In the words of Major Williams, forcing one instructor "to bear the responsibility for two platoons so that another Platoon leader could arrive late and leave early from camp is inherently unfair and met neither the expectations of the cadets or the staffing needs of the camp." *Id.* at

00208. The commander of the summer camp, Colonel Alvin L. Ginsberg, U.S.A. Retired, distributed a memo on June 11, 1996, complaining about Bynum's late arrival to and early departure from the summer camp and the stress Bynum's conduct placed on the other platoon leaders. Also, the commander of the company of which Bynum's platoon of cadets was a part distributed a memorandum on June 10, 1996, making known his dissatisfaction with Bynum's conduct during the summer camp, and the adverse effects Bynum's failure to fully participate had on other JROTC personnel.

In the meantime, Lieutenant Colonel Vanbebber sent a memorandum, dated May 23, 1996, to the appropriate officials of the United States Army requesting that the certification of Bynum be terminated. By the time the memo was written, Bynum had made known to Lieutenant Colonel Vanbebber that he did not intend to fully perform his duties at the summer camp. In addition to the problem related to the failure of Bynum to fully perform his duties, Lieutenant Colonel Vanbebber gave as reasons why the certification should be terminated that Bynum had "been very slow in transitioning from active duty to retired status" and that "[h]e is quick to fix blame for all problems on the lack of good management practices on the part of those in charge, however, is not inclined to accept any of the responsibility for his actions." *Id.* at 00091.

On May 28, 1996, Bynum filed with the U.S. Equal Employment Opportunity Commission ("EEOC") a charge of discrimination against FWISD, complaining that he had been subjected to discrimination from September 15, 1995, through May 8, 1996. He complained that he was issued an unsatisfactory duty performance, denied a reasonable accommodation, and requested to resign on May 8, 1996, specifically complaining that Lieutenant Colonel Vanbebber had advised him that Bynum's religious practices were preventing him from performing his duties. Bynum said

that he believed that he was being discriminated against because of his religion.

Following the problems that were created by Bynum's failure to fully perform his duties at the summer camp, the interpersonal relationship between Major Williams and Bynum fell apart. Major Williams, Sergeant Hooper, and Bynum were no longer able to work together effectively as a team. Even before then, the tension between them was extremely strained, and was having a negative impact on the JROTC program. After the summer camp episode, on at least one occasion Bynum failed to follow instructions given him by Major Williams, and failed to properly perform certain of his duties related to supplies. Major Williams became so dissatisfied that he requested one of his superiors, Lieutenant Colonel Luther W. Berry, to remove Bynum from O.D. Wyatt High School and place him in another school within the FWISD.

At one point in time Major Williams discussed with Lieutenant Colonel Vanbebber the possibility of reducing Bynum's salary and permitting him to perform only classroom duties, but they decided that such an accommodation would not be practical because, if that arrangement were to be made, Major Williams and Sergeant Hooper would still be responsible for all the extracurricular activities in violation of the Army staffing guidelines. Moreover, that would not have been an acceptable solution for the further reason that it would defeat the nature and spirit of one of the goals of the JROTC program that instructors and cadets work together as a team, both in the classroom and at extracurricular events.

By letter of August 5, 1996, the Department of the Army informed Bynum that it was considering decertification of him based on unsatisfactory conduct and performance during his one-year conditional certification. Bynum was given an opportunity to respond. In response, an executive director of FWISD wrote an August 14, 1996, letter to the Department of the Army on behalf of Bynum, encouraging the Army not to decertify Bynum, and pointing out Bynum's good qualities. The Executive Director's letter was accompanied by a memo pertaining to remarks that had been made by the principal of O.D. Wyatt High School to the effect that he supported an excellent evaluation of Bynum. On August 15, 1996, the principal prepared a memo to "Whom It May Concern" saying that he was not aware of any "negatism" in Bynum's job performance, and that he stands behind a school district evaluation that showed that Bynum's performance was satisfactory. Pl.'s App. at 000039.

In mid-August 1996 FWISD suspended Bynum from his duties as JROTC instructor, with pay, effective August 12, 1996, pending further inquiry. After having received Bynum's response to its August 5 letter, the Department of the Army, by letter dated September 17, 1996, announced its decision that Bynum's certification as a JROTC instructor would be withdrawn effective September 20, 1996, and that Bynum was "no longer authorized to instruct or associate officially in any manner with the Army Junior ROTC program." Def.'s App. 00066. On September 23, 1996, Bynum was again notified by FWISD that he was being suspended from his duties, with pay, "pending termination," with the comment that "Mr. Bynum has been decertified by the U.S. Army as an ROTC Instructor and can't be in classroom." Pl.'s App. 000089.

By letter dated September 26, 1996, Bynum was notified by FWISD that the Administration was recommending his termination for good cause, saying that "[g]ood cause includes, but is not limited to the fact that you have been decertified by the Department of the Army as an instructor in the Junior Reserve Officers Training Corp." Id. at 00068. The letter explained that by reason of the decertification Bynum could no longer act as a teacher in the program. Bynum was informed by letter dated October 23, 1996, that the Board of Education approved the Administration's recommendation that his employment be terminated, giving as the reason the same

one that had been given in the September 26 letter. The October 23 letter informed Bynum that his termination was effective as of October 22, 1996.

In the meantime, Bynum filed his second charge of discrimination against FWISD with the EEOC, this time complaining that he was of the belief that he had been retaliated against for filing his previous charge against FWISD. He claimed that he had been recommended for decertification in August 1996, that he had been relieved of his duties as a JROTC instructor about one week later, and that in September 1996 he was suspended without pay pending a hearing on recommendations to terminate him.

On July 25, 1997, the EEOC issued a letter of determination in reference to the charges of discrimination Bynum had filed against FWISD, concluding that Bynum had been subjected to discrimination in violation of Title VII. Apparently a right-to-sue letter thereafter was issued. This action was instituted on August 14, 1998, by the filing by Bynum of his original complaint.

## V.

### Legal Analysis of Bynum's Title VII Claim

A. *Pertinent Provisions of Title VII and Related Case Authority:*

Title VII prohibits religious discrimination in employment. 42 U.S.C. § 2000e–

**5.** Title 42 U.S.C. § 2000e–2(a)(1) provides:

It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . .

**6.** 42 U.S.C. § 2000e(j) provides:

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's

2(a).[5] An employer engages in an unfair employment practice if he discriminates against an employee because of any aspect of his religious practices or beliefs, unless the employer shows that it cannot "reasonably accommodate" the employee's religious needs without "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).[6]

A plaintiff establishes a prima facie case of religious discrimination when he or she demonstrates: (1) that he or she has a bona fide religious belief that conflicts with an employment requirement; (2) that he or she informed his or her employer of this belief; and (3) that he or she suffered an adverse employment decision because of failure to comply with the conflicting employment requirement.[7] *See, e.g., Turpen v. Missouri–Kan.–Tex. R.R. Co.,* 736 F.2d 1022, 1026 (5th Cir. 1984); *Brener v. Diagnostic Center Hosp.,* 671 F.2d 141, 144 (5th Cir.1982); *Glovinsky v. Cohen,* 983 F.Supp. 1, 3 (D.D.C. 1997). The Fifth Circuit has said that the adverse employment decision must be an "ultimate employment decision." *Dollis v. Rubin,* 77 F.3d 777, 781–82 (5th Cir.1995). If, and when, the plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to demonstrate that it is unable to reasonably accommodate the plaintiff's needs without suffering undue hardship. *Turpen,* 736 F.2d at 1026; *Brener,* 671 F.2d at 144.

religious observance or practice without undue hardship on the conduct of the employer's business.

**7.** Bynum contends that a prima facie case of religious discrimination has been created by the findings and conclusions in the July 25, 1997, letter of determination issued by the U.S. Equal Employment Opportunity Commission. Findings and conclusions in such a determination letter can serve to establish a prima facie case. *See Turpen v. Missouri–Kan.–Tex.R.R. Co.,* 736 F.2d 1022, 1026 (5th Cir.1984). As explained in subsection V.F. of this memorandum opinion and order, the court has concluded that in this case the letter of determination does not establish a prima facie case of discrimination.

Title VII does not require that the accommodation process infringe on the rights of the plaintiff's fellow employees, for, as the Supreme Court explained in *Trans World Airlines, Inc. v. Hardison:*

> The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities.... It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

432 U.S. 63, 81, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). An accommodation that would force other employees, against their wishes, to modify their work schedules to accommodate the religious beliefs of the complaining employee would be unreasonable and an undue hardship. *See Eversley v. MBank Dallas,* 843 F.2d 172, 176 (5th Cir.1988). Nor is the employer required to bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs. *Hardison,* 432 U.S. at 84, 97 S.Ct. 2264. Title VII does not require the employer to choose any particular form of reasonable accommodation, or demonstrate that the plaintiff's alternative forms of accommodation would result in undue hardship. *See Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68–69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). Title VII dictates that "any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Id.* at 68, 107 S.Ct. 367. While the statutory burden to accommodate rests with the employer, "the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer." *Brener,* 671 F.2d at 146.

**B. *There Has Been No Prima Facie Case Established as to the Action of FWISD in Terminating Bynum's Employment:***

The court is satisfied that the summary judgment record establishes without genuine dispute that FWISD terminated Bynum's employment because of the decertification by the Department of the Army of Bynum as a JROTC instructor. Bynum as much as admits that fact in his complaint. As previously noted, Bynum was suspended from all duties in the position of JROTC instructor with FWISD in September 1996 because he had been decertified by the Army as a JROTC instructor, and could not be in the classroom; the letter informing him of the Administration's recommendation that he be terminated explained that the good-cause basis for the termination was the fact that he had been decertified by the Department of the Army as an instructor in the JROTC program and that the decertification caused him not to be eligible to act as a teacher in the program; and, the October 23, 1996, letter notifying Bynum of the termination of his employment gave the same explanation. Those explanations are not challenged by summary judgment evidence. The affidavit of Dr. Philip Peregrine corroborates the written documentation that the reason for Bynum's termination was his decertification rather than his religious beliefs. Def.'s App. at 00001, 00003–4.

Terminating Bynum's employment was the only viable option FWISD had once Bynum was decertified. *Cf. Washington v. Kirksey,* 811 F.2d 561, 564 (11th Cir.), *cert. denied,* 484 U.S. 827, 108 S.Ct. 96, 98 L.Ed.2d 56 (1987) (noting that once a JROTC instructor has been decertified by the Army, the "only viable option available to the School Board" was to "terminate his contract because he no longer could teach in the ... school system."). Bynum admits in his complaint, as amended, that "certification [was] a necessary credential to ... keeping his employment as a

JROTC instructor," Pl.'s First Am.Compl. at 3, ¶ 12, and that the "decertification caused [Bynum] to be unable to obtain any position as a JROTC instructor," *id.* at 4, ¶ 17.

For the reasons given above, the court concludes that Bynum's Title VII claim cannot stand on the basis of the termination of his employment by FWISD because there is no evidence that he was terminated because of his failure to comply with an employment requirement that conflicted with any of Bynum's religious beliefs.

### C. *Lieutenant Colonel Vanbebber's Request That Bynum Be Decertified Cannot Form a Basis of a Prima Facie Case:*

■ Bynum argues that he would not have been decertified by the Army if Lieutenant Colonel Vanbebber had not requested of the Army that he be decertified, that FWISD should be held accountable for the conduct of Lieutenant Colonel Vanbebber in making such a request, and that, therefore, he has established a prima facie case against FWISD of religious discrimination that led to the termination of his employment. Bynum's argument fails to properly consider the unique relationship existing between FWISD and the Department of the Army in the conduct of the JROTC program and the nature of the obligations owed by Lieutenant Colonel Vanbebber to the Department of the Army over which FWISD did not have control.

The court is satisfied from the summary judgment evidence that Lieutenant Colonel Vanbebber was an employee of FWISD at pertinent times. *Cf. Cavazos v. United States,* 776 F.2d 1263, 1265 (5th Cir.1985). However, there is no summary judgment evidence that Lieutenant Colonel Vanbebber's duties of employment with FWISD embraced his conduct in asking the Department of the Army to decertify Bynum, or that he had any agency authority from FWISD to make such a decertification request. On the other hand, there

is persuasive summary judgment evidence that when Lieutenant Colonel Vanbebber requested the decertification he was performing a duty he owed to the Army. He had an individual responsibility to the Army to conduct the JROTC program according to Army policy and the controlling regulation, and to maintain standards acceptable to the Army. Lieutenant Colonel Vanbebber considered that his "responsibility for ensuring that the JROTC program maintained standards acceptable to the Army was directly to the Army and independent of the school district." Def.'s App. at 00080. And, he considered that his request that the Army withdraw Bynum's "probationary certification as a JROTC instructor [was] in [his] military capacity and not as an agent of FWISD." *Id.* at 00084. He gave the following explanation in his affidavit:

> I was not acting under the direction of anyone within the FWISD administration, nor did I seek or receive the authorization of anyone in the FWISD prior to requesting the withdrawal of Plaintiff's probationary certification. I certainly never requested nor received authorization from the Board of Trustees of FWISD. As a courtesy, I forwarded a copy of the request for withdrawal of Plaintiff's probationary certification with attachments to members of the FWISD administration.

*Id.* Any presumption that he was acting as agent of, or within the scope of his employment for, FWISD was conclusively put to flight by the undisputed summary judgment evidence.

There simply is no summary judgment evidence that would support a conclusion that the conduct of Lieutenant Colonel Vanbebber in requesting Bynum's decertification should be imputed to FWISD. The evidence is to the contrary. Therefore, the court concludes that the request for decertification cannot form an ingredient of a prima facie case of religious discrimination against FWISD.

D. *Lieutenant Colonel Vanbebber's Unsatisfactory Performance Evaluation Does Not Create a Prima Facie Case:*

■ Bynum argues that the unsatisfactory evaluation of his performance as a JROTC instructor Lieutenant Colonel Vanbebber prepared in May 1996 was an adverse employment action taken against him by FWISD that created a prima facie case of religious discrimination. As an initial matter on this point, the court notes the following unchallenged explanations given by Lieutenant Colonel Vanbebber in his affidavit for the making of the performance evaluation and of the capacity in which he was acting when he made and reported it:

> This Unsatisfactory Duty Performance memorandum was issued by me in my military capacity as the Director of Army Instruction and pursuant to my obligation to ensure that the JROTC program was conducted according to Army policy and regulations and met the standards acceptable to the Army.... The Unsatisfactory Duty Performance memorandum outlined the ways in which Plaintiff's performance of his JROTC duties failed to comply with the duties and responsibilities set forth in the certification materials for JROTC instructors.... I did not address Plaintiff's teaching abilities or whether he performed satisfactorily in the classroom.

Def.'s App. at 00082 (internal record references omitted). There is no summary judgment evidence that Lieutenant Colonel Vanbebber was acting within the scope of his employment for FWISD, or as an agent of FWISD, when he made the evaluation of Bynum's performance as a JROTC instructor. But, there is summary judgment evidence that when he made the evaluation he was fulfilling an obligation he owed to the Department of the Army. Therefore, Bynum has failed to adduce summary judgment evidence that would support a conclusion that Lieutenant Colonel Vanbebber's conduct in making the performance evaluation should be imputed to FWISD.

■ Moreover, "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis,* 77 F.3d at 781–82. The Fourth Circuit has said that "[d]isparate treatment theory as it has emerged in application of ... 42 U.S.C. § 2000e–2(a)(1), has consistently focused on the question of whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensating." *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). Thus, to establish a case of religious discrimination based on the performance evaluation and the related letter of unsatisfactory duty performance, Bynum must demonstrate that they constitute adverse ultimate employment decisions. This he has failed to do. The same would be true if the test, as Bynum seems to contend, is "adverse employment decision," rather than "ultimate employment decision." Here, there is no evidence that the performance reprimand issued by Lieutenant Colonel Vanbebber had any effect on Bynum's employment with the FWISD. Indeed, after Lieutenant Colonel Vanbebber made the evaluation and engaged in the related actions adverse to Bynum in the first half of May 1996, FWISD entered into a new employment contract with Bynum for the scholastic year 1996–97, indicating that Lieutenant Colonel Vanbebber's conduct at that time did not have an adverse effect on the employment status of Bynum.

E. *The Summary Judgment Evidence Establishes Without Genuine Dispute That FWISD Accommodated Bynum as Much as it Could Without Suffering "Undue Hardship":*

■ As noted in section IV of this memorandum opinion and order, Bynum

was given rather significant accommodations. His fellow instructors, Major Williams and Sergeant Hooper, accommodated him by doing his work at weekend events at which his attendance otherwise would have been required as part of his job. The accommodations extended to Bynum because of his religious beliefs included the attendance by his fellow instructors at Friday night football games and at events in which fewer than 150 cadets from O.D. Wyatt High School would be participating. Bynum was not satisfied with the accommodations given him. Rather, he wanted his fellow instructors and superiors to capitulate by doing all of the work he should have been doing Friday nights and Saturdays. The summary judgment record shows without dispute that the accommodations afforded Bynum were causing hardships in the conduct of the JROTC program, not only at O.D. Wyatt High School but in the FWISD system generally. There is no evidentiary basis in the summary judgment record for any reasonable conclusion other than that FWISD made reasonable efforts to accommodate Bynum, that those attempts at accommodation caused FWISD undue hardship, and that further accommodation of Bynum probably would have disrupted the JROTC program at O.D. Wyatt as well as the program district-wide. Therefore, even if Bynum could establish a prima facie case of religious discrimination, it would be overcome by the summary judgment evidence showing that FWISD satisfied its accommodation obligation.

In evaluating the reasonableness of the accommodation provided by FWISD, the court must take into account the demands placed on the JROTC program by the Army regulation. If FWISD was to participate in the JROTC program, it was obligated to adhere to the standards imposed by the applicable regulation, as those standards were interpreted and applied by personnel who were certified by the Department of the Army to conduct the program. The decision was made by the certified personnel that the program could not properly be conducted unless Bynum was willing to participate at some level in Friday evening and Saturday activities. While he did participate in some of those activities, he declined to participate in important ones, and made known an intent to discontinue weekend participation entirely. His conduct unfairly shifted performance of his duties to his fellow instructors. It was causing dissatisfaction within the ranks; and, it was preventing the program from functioning as it was intended to function.

The bottom line is that FWISD could not fully accommodate what Bynum professed his religious beliefs to be without undue hardship. Therefore, there would not be basis under the summary judgment record for a Title VII claim in any event.

F. *The EEOC Determination Letter is not Summary Judgment Evidence of Religious Discrimination:*

██ Bynum argues that the findings and conclusions expressed against FWISD in the EEOC letter of determination serve to establish a prima facie case of discrimination, thus requiring denial of FWISD's motion for summary judgment, relying for that proposition on *Turpen,* 736 F.2d 1022. The language in *Turpen* upon which Bynum relies is *dicta* inasmuch as the district court had found, and the parties were not contesting the finding, that the employee had made out a prima facie case. *Id.* at 1026.

The statement in the *Turpen* opinion that "the determination of probable cause by an administrative agency is also admissible to establish a prima facie case," *id.,* was supported by a citation to *Smith v. Universal Servs.,* 454 F.2d 154 (5th Cir. 1972). In *Smith,* the Fifth Circuit, while noting that "the [EEOC] report is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial," 454 F.2d at 157, held that the trial court erred in failing to admit into evidence at trial the EEOC's

investigation report and finding of probable cause. The Court concluded that the report had probative value on the issue of discrimination because it was prepared by "an investigator, trained and experienced in the area of discriminatory practices and the various methods by which they can be secreted...." *Id.* Implicitly recognizing that the report was hearsay that normally would not be received as evidence over a hearsay objection, the Court concluded that the report was admissible as a business record pursuant to the Federal Business Records Act, 28 U.S.C. § 1732, thus making the report "admissible as an exception to the hearsay rule under the federal statute." *Id.* Approximately two years after the Fifth Circuit handed down the *Smith* decision, the evidence statute on which the Fifth Circuit relied in holding that an EEOC report qualifies as an exception to the hearsay rule was repealed upon the adoption of the Federal Rules of Evidence. Pub.L. No. 93–595, 1974 U.S.C.C.A.N. 2215, 2251. Later Fifth Circuit decisions have cited *Smith* in support of the proposition that an EEOC determination can be admissible as evidence of discrimination, *see, e.g., McClure v. Mexia Indep. Sch. Dist.,* 750 F.2d 396, 399 (5th Cir.1985); *Garcia v. Gloor,* 618 F.2d 264, 272 (5th Cir.1980), but those decisions did not rely on the business records exception to the hearsay rule, relying instead on the public records and reports exception found at Federal Rule of Evidence 803(8) (which allows use as evidence in civil proceedings of factual findings in reports of public offices or agencies resulting from an investigation made pursuant to authority granted by law, unless the circumstances indicate lack of trustworthiness). *McClure,* 750 F.2d at 399; *Garcia,* 618 F.2d at 272.

With very few exceptions, all court opinions in which attention has been directed to admissibility in evidence of EEOC determinations have involved the issues of whether the report should be received into evidence at trial, *see, e.g., Cortes v. Maxus Exploration Co.,* 758 F.Supp. 1182 (S.D.Tex.1991), *aff'd,* 977 F.2d 195 (5th Cir.1992), or the evidentiary weight the report should have once it has been received as trial evidence, *see, e.g., Moss v. Ole South Real Estate, Inc.,* 933 F.2d 1300, 1307–08 (5th Cir.1991). Rarely has the issue been discussed in a summary judgment context. But, in a recent opinion dealing directly with that subject, the Tenth Circuit held that a favorable determination letter regarding a claim of race-based failure to promote will not necessarily defeat a motion for summary judgment filed by the employer. *Simms v. Oklahoma ex rel. Dep't of Mental Health,* 165 F.3d 1321, 1331 (10th Cir.1999). The Court explained that "when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one." *Id.* A contrary result seems to have been reached seventeen years earlier by the Ninth Circuit in *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.,* 685 F.2d 1149, 1156 (9th Cir.1982) (holding that the EEOC report was sufficient at least to create an issue of fact as to whether there had been unlawful discrimination, and that it was therefore improper for the trial court to resolve the issue on summary judgment).

The court is persuaded that it should not treat the favorable EEOC letter of determination in this case as creating an issue of fact. The summary judgment record independent of the letter of determination does not raise an issue of material fact that would prevent the grant of summary judgment. Here, the summary judgment record (putting aside the EEOC letter of determination) establishes from a legal standpoint that FWISD did not engage in unlawful discrimination against Bynum. If the EEOC letter were to be permitted to require this case to go forward to a trial notwithstanding the legal effect of the remaining contents of the summary judgment record, the EEOC investigator would have been permitted to supplant the court in the performance of the legal functions assigned to the court in a summary judg-

ment proceeding, *see* FED.R.CIV.P. 56(c), and, more generally, in Title VII litigation, *see Dickerson v. Metropolitan Dade County,* 659 F.2d 574, 579 (5th Cir. Unit B Oct.1981) (noting that in Title VII litigation the district court reviews the evidence *de novo,* independent of any determination by the EEOC) and *Weahkee v. Perry,* 587 F.2d 1256, 1263 (D.C.Cir.1978) (saying that "the principle which should guide the court's analysis of Title VII cases is that there is to be a fresh determination of the facts and issues by the district court").

Federal Rule of Civil Procedure 56(c) directs that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This does not allow for a conclusion that a court should deny a summary judgment based on a record that otherwise would require it to be granted simply because an EEOC investigator has made unfounded determinations of discrimination. In this case, the court ordered the parties to cause the investigative record of the EEOC to be put before the court, not as primary evidence of the truth of the contents of the record, but so that the court might determine if the EEOC had evidence of discrimination that was not in the summary judgment record. The court notes that the EEOC file does not contain anything that, if added to the summary judgment record as primary evidence, would change any of the conclusions the court has reached in favor of FWISD.

It is apparent that the EEOC investigator must not have applied the proper legal standards, and certainly did not take into account in determining what conduct should be imputed to FWISD the dual role of the retired military personnel who were responsible for oversight and operation of the JROTC program of FWISD. The court has concluded that as a matter of law the EEOC determinations against FWISD

have such a "lack of trustworthiness," FED. R.EVID. 803(8), that they should not play a role in determining the outcome of FWISD's motion for summary judgment.

## VI.

### *The Court is Dismissing the State Court Breach of Contract Claims*

The court has subject matter jurisdiction over this action by reason of the assertion by Bynum of a claim under Title VII. *See* 28 U.S.C. § 1331; 42 U.S.C. § 2000e–5(f)(3). Bynum's breach of contract claims against FWISD are state law claims over which this court has supplemental jurisdiction by reason of the provisions of 28 U.S.C. § 1367(a). Because the court is dismissing the only claim over which it has original jurisdiction, the court, as authorized by 28 U.S.C. § 1367(c)(3), is dismissing the state law claims as well. Apparently discovery has not commenced in this action, and no significant additional expense would be incurred by the parties in starting over again in a court of the State of Texas as to the state law claims.

## VII.

### *ORDER*

The court ORDERS that FWISD's motion for summary judgment, be, and is hereby, granted by dismissal of all claims of Bynum, with the dismissal of the Title VII claim to be on the merits and the dismissal of the remaining claims to be pursuant to the authority of 28 U.S.C. § 1367(c)(3).

The court further ORDERS that all claims of Bynum against FWISD under Title VII be, and are hereby, dismissed.

The court further ORDERS that all other claims asserted by Bynum against FWISD in this action be, and are hereby, dismissed without prejudice.

### *FINAL JUDGMENT*

Consistent with the memorandum opinion and order signed by the court this day,

The court ORDERS, ADJUDGES, and DECREES that the motion for summary judgment of defendant, Fort Worth Independent School District, ("FWISD") be, and is hereby, granted.

The court further ORDERS, ADJUDGES, and DECREES that plaintiff, William C. Bynum, ("Bynum") take nothing on his claims against FWISD.

The court further ORDERS, ADJUDGES, and DECREES that all claims and causes of action by Bynum against FWISD in the above-captioned cause be, and are hereby, dismissed with prejudice.

The court further ORDERS, ADJUDGES, and DECREES that FWISD have and recover its costs from Bynum.